# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――

Argued April 17, 2025　　　　　Decided August 1, 2025

No. 24-1199

SIERRA CLUB AND PUBLIC CITIZEN,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MEXICO PACIFIC LIMITED LLC AND SAGUARO CONNECTOR
PIPELINE, L.L.C,
INTERVENORS

―――

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

―――

*Rebecca McCreary* argued the cause for petitioners. With her on the joint briefs were *Douglas Hayes* and *Nandan M. Joshi*.  *Eric E. Huber* entered an appearance.

*Jared Fish*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent.  With him on the brief were *David L. Morenoff*, Acting General Counsel, and *Robert H. Solomon*, Solicitor.  *Lona T. Perry*, Attorney, entered an appearance.

*Jeremy C. Marwell* argued the cause for intervenors in support of respondent. With him on the joint brief were *James F. Bowe, Jr.*, *Ashley C. Parrish*, *Garrett T. Meisman*, and *Ryan J. Collins*.

Before: MILLETT, KATSAS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: The Federal Energy Regulatory Commission approved 1,000 feet of natural-gas pipeline straddling the border with Mexico. That led to this petition by the Sierra Club and Public Citizen.

First, the Petitioners say that FERC needed to exercise jurisdiction over a much longer stretch of pipeline, which begins at the 1,000-foot border pipeline and runs for 157 miles into rural Texas. Second, the Petitioners argue that even if FERC properly declined jurisdiction, FERC still should have considered the environmental impact of that pipeline. Third, they claim that FERC improperly failed to consider alternatives to the border-crossing pipeline. And fourth, they briefly argue that FERC's approval of the border-crossing pipeline itself was arbitrary and capricious.

We reject all of the Petitioners' arguments and deny their petition.

**I**

**A**

"As a creature of statute, FERC has only those powers endowed upon it by statute." *Emera Maine v. FERC*, 854 F.3d

9, 24 (D.C. Cir. 2017) (cleaned up). Under the Natural Gas Act, and by delegation from the Energy Department, FERC has authority over the "particular facilities" used in natural-gas exports, as well as "the place of . . . exit for exports." Department of Energy Delegation Order No. S1-DEL-FERC-2006 ("DOE Order"), § 1.21(A) (May 16, 2006); *see also* 15 U.S.C. § 717b(a) (NGA § 3) (requiring authorization by FERC's predecessor agency to "export any natural gas"). It also has authority over "the transportation in interstate commerce of natural gas." 15 U.S.C. § 717f(c)(2) (NGA § 7); *see also* 15 U.S.C. § 717(b) (NGA "shall apply to the transportation of natural gas in interstate commerce . . . and to the importation or exportation of natural gas in foreign commerce . . . , but shall not apply to any other transportation or sale of natural gas . . . ."); DOE Order, § 1.21(B) (delegating to FERC the ability to "[c]arry out all functions under section[] . . . 7 of the Natural Gas Act").

In plain English, FERC has jurisdiction when natural gas crosses the nation's border (its § 3 jurisdiction) and when it crosses state lines (its § 7 jurisdiction). Meanwhile, state regulators have the power to regulate intrastate natural-gas infrastructure. *See Associated Gas Distributors v. FERC*, 899 F.2d 1250, 1255 (D.C. Cir. 1990) ("FERC lacks jurisdiction over the transportation of gas in intrastate commerce; the states regulate such transportation."); *see also* 15 U.S.C. § 3301(16) (definition of "intrastate pipeline"). So, as a general matter, FERC handles interstate and international pipelines, and state regulators handle intrastate pipelines.

But sometimes there's overlap: Some intrastate pipelines carry interstate gas, and other intrastate pipelines connect with international pipelines or terminate at liquified-natural-gas terminals for natural-gas exports abroad. In those situations, special rules apply.

*First*, under § 311 of the Natural Gas Policy Act, FERC "may . . . authorize any *intrastate* pipeline to transport natural gas on behalf of . . . any *interstate* pipeline" without thereby bringing the intrastate pipeline within FERC's § 7 jurisdiction. 15 U.S.C. § 3371(a)(2) (emphases added); *id.* § 3431(a)(2)(A).

*Second*, an intrastate pipeline that transports natural gas to a domestic liquified-natural-gas terminal for export abroad — even a lengthy pipeline entirely within a single state — is subject to FERC's exclusive jurisdiction. *See id.* § 717a(11) (definition of liquified-natural-gas terminal includes "all natural gas facilities located onshore . . . that are used to . . . transport . . . natural gas that is . . . exported to a foreign country"); *id.* § 717b(e) ("exclusive authority" over liquified-natural-gas terminals).

And *third*, when an otherwise intrastate pipeline runs to the border and connects with an international pipeline, FERC has § 3 jurisdiction over that pipeline, but FERC may cede its authority over the intrastate portion of the pipeline to the state regulator. *See Distrigas Corp. v. Federal Power Commission*, 495 F.2d 1057, 1064 (D.C. Cir. 1974). In practice, FERC has almost invariably done so — generally ceding jurisdiction over all but 1,000 feet or so of border-crossing pipeline to state regulators. *See infra*, section III.A.

When FERC's approval of a pipeline constitutes a "major Federal action[ ] significantly affecting the quality of the human environment," it must consider the "reasonably foreseeable environmental effects" of that action under the National Environmental Policy Act. 42 U.S.C. § 4332(2)(C)(i)-(ii). FERC must also consider "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and [that] meet the

purpose and need of the proposal." *Id.* § 4332(2)(C)(iii). Importantly, however, FERC has "broad latitude" to decide "where to draw the line" in considering environmental effects, and "substantial discretion" to determine what constitute "feasible alternatives." *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 145 S. Ct. 1497, 1512-13 (2025).

**B**

This case concerns a proposed natural-gas pipeline in Hudspeth County, Texas — twice the landmass of Delaware, with 0.3% of its population. A major public pipeline company, ONEOK Inc., plans to build the Saguaro Pipeline from the heart of a prolific oil-and-gas-producing region, through several West Texas counties, to the Rio Grande in Hudspeth County. There it would cross the border and connect with a Mexican pipeline that runs to a liquified-natural-gas export terminal on Mexico's Sonoran coast.[1]

Though the proposed pipeline would be completely contiguous, you can think of it as having three segments: (1) the "Connector Pipeline," which extends about 155 miles from a natural-gas price-reporting point called the "Waha Hub" to the verge of the Mexican border;[2] (2) the "Border Facility," a 1,000-foot stretch that crosses the Rio Grande into Mexico; and (3) the Mexican "Sierra Madre" pipeline starting at the

---

[1] The Mexican part of the pipeline would be built by ONEOK's joint intervenor here, Mexico Pacific Limited. ONEOK intervenes under the name of its wholly owned subsidiary, Saguaro Connector Pipeline LLC.

[2] The Petitioners say that the Connector Pipeline is 157 miles long; FERC says it is 155 miles long. Neither party explains the two-mile discrepancy.

border, crossing Mexico, and ending at a liquified-natural-gas terminal on the Gulf of California.

FERC concluded that it did not have — or would not exercise — jurisdiction over Texas's Connector Pipeline. 186 FERC ¶ 61114, at pp. 61649-53 (2024). It reasoned that the Connector Pipeline will not cross the international border, will not cross a state line, and will not carry interstate gas upon entering service. *Id.* at p. 61650-51. As to the 1,000-foot Border Facility, FERC conducted an Environmental Assessment, determined that the environmental impact is minimal, and elected not to produce a full-blown environmental impact statement. FERC deemed the Border Facility in the public interest. *Id.* at p. 61669.

After FERC reached the same conclusions on rehearing, the Petitioners brought this petition. *See generally* 188 FERC ¶ 61029 (2024).

**II**

We review FERC's orders to ensure that they're not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). FERC's actions must be "reasonable and reasonably explained," and its factual findings must be supported by "substantial evidence." *Alabama Municipal Distributors Group v. FERC*, 100 F.4th 207, 210, 212 (D.C. Cir. 2024). In conducting NEPA analysis, FERC has "substantial discretion," so we "should afford substantial deference" to "agency choices" that "fall within a broad zone of reasonableness." *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 145 S. Ct. 1497, 1512-13 (2025). Indeed, the "bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 1515.

7

## III

The Petitioners say that FERC was required to exercise jurisdiction over the Connector Pipeline under § 3 or § 7 of the Natural Gas Act. We disagree. While FERC had the authority to exercise jurisdiction over the Connector Pipeline under § 3 of the Natural Gas Act, it also had authority to decline to do so. Here, FERC reasonably declined to exercise jurisdiction over the Connector Pipeline. We also conclude that FERC correctly declined to assert jurisdiction under § 7 of the Natural Gas Act.

## A

FERC declined to wield § 3 authority over the (157-mile) Connector Pipeline. 188 FERC ¶ 61029, at pp. 61132-34 (2024). Instead, it exercised its § 3 authority over only the (1,000-foot) Border Facility. *Id.* at pp. 61134-36. This decision is consistent with FERC's prior practice, and it reasonably respects the role of state regulators in our federal system.

The Petitioners contend that "the entire 157-mile Saguaro Pipeline is a single *facility that is to be used for the export* of gas from the Waha Hub to Mexico," and that "the entire pipeline is *necessary to accomplish the export of gas* from the Waha Hub to Mexico." Petitioners Br. 16 (citing 18 C.F.R. § 153.5(a) ("facilit[y] . . . used for . . . export"); *Trunkline Gas Co., LLC*, 155 FERC ¶ 61328, at p. 63008 (2016) ("necessary to accomplish an export")). They appeal to the pipeline's obvious big-picture purpose: to facilitate the export of natural gas from Texas to Mexico. Because the Connector Pipeline serves that purpose, the Petitioners maintain, it's within FERC's § 3 jurisdiction.

The Petitioners have a point: FERC does have the statutory authority to regulate the Connector Pipeline under § 3. But must FERC exercise its § 3 authority to the fullest? No — and very often it does not.

In *Distrigas Corp. v. Federal Power Commission*, 495 F.2d 1057, 1064 (D.C. Cir. 1974), this court said that "[u]nder Section 3, the Commission's authority over imports [and exports] of natural gas is at once plenary and elastic." *Id.*[3] FERC's power is plenary in that it has authority to regulate all pipelines and pipeline facilities transporting natural gas to and from places of import and export. *See* Department of Energy, Delegation Order No. 00–004.00A, § 1.21(A) (May 16, 2006); 42 U.S.C. § 7172(f). And *Distrigas* called FERC's § 3 authority "elastic" in the sense that its authority can be used to cover gaps where "regulation cannot or will not, as a practical

---

[3] *Distrigas* involved FERC's predecessor agency, the Federal Power Commission, but its holding still applies to FERC. *See East Tennessee Natural Gas Co. v. FERC*, 631 F.2d 794, 796 n.3 (D.C. Cir. 1980) (explaining that "Congress abolished the FPC and transferred responsibility for regulation under the Natural Gas Act to the newly created Federal Energy Regulatory Commission"); Department of Energy Organization Act, Pub. L. No. 95-91, §§ 204, 301(b), 401(a), 402(a)(1), 402(e), 642, 91 Stat. 565, 571, 578, 582-83, 585, 599 (1977) (codified as amended at 42 U.S.C. §§ 7134, 7151(b), 7171(a), 7172(a)(1), 7172(e), 7252) (creating FERC, transferring the Federal Power Commission's functions, and authorizing the Energy Secretary to delegate responsibilities to FERC); DOE Order, § 1.21(A)-(B) (delegating to FERC certain NGA functions previously belonging to the Federal Power Commission); *cf. West Virginia Public Services Commission v. Department of Energy*, 681 F.2d 847, 858 (D.C. Cir. 1982) ("The DOE Act's restructuring of the administrative framework did not alter the flexibility of [federal energy agencies'] statutory authority under [NGA] section 3.").

matter, be imposed by the states." *Id.*; *see also id.* ("the purpose of the Natural Gas Act" is "to be achieved by [FERC] regulation broadly complementary to that reserved to the States" (cleaned up)); *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 631 (1972) (With the Natural Gas Act, "Congress meant to create a comprehensive and effective regulatory scheme of dual state and federal authority." (cleaned up)).   In sum, *Distrigas* said that "Section 3 supplies the Commission not only with the power necessary to prevent [such] gaps in regulation, but also with flexibility in exercising that power."   495 F.2d at 1064.

The upshot is that even though FERC has the power to regulate the Connector Pipeline, FERC also has the power *not* to regulate it.   And in its exercise of that discretion, FERC will often not regulate a pipeline when FERC expects that the pipeline will be regulated by a state pipeline regulator like the Texas Railroad Commission.[4]

FERC's decision to exercise or decline to exercise § 3 jurisdiction must be "reasonable and reasonably explained" and grounded in "substantial evidence."   *Alabama Municipal Distributors Group*, 100 F.4th at 210, 212.   That means FERC must explain with "reasoned consideration and on the basis of substantial evidence, whether and in what manner to exercise its flexible Section 3 power."   *Distrigas*, 495 F.2d at 1066.

---

[4] Yes, the Texas *Railroad* Commission.   Established in 1891 to regulate railroads, the Commission has also regulated pipelines (as common carriers) and oil and gas production for more than a century. *See* Regulating Pipe Lines, ch. 30, §§ 2, 4, 6, 1917 Tex. Gen. Laws 48, 49-51; Conservation of the Oil and Gas Resources of the State; Defining "Waste" and Empowering the Railroad Commission to Make and Enforce Regulations with Reference to Same, ch. 155, art. 3, 1919 Tex. Gen. Laws 285, 286.

In the administrative record, FERC offered a potpourri of reasons why it didn't regulate the Connector Pipeline. At times, FERC erroneously suggested that § 3 prohibited it from exercising jurisdiction over the Connector Pipeline. 188 FERC ¶ 61029, at p. 61133; *see also id.* ("under NGA section 3, the Commission only has jurisdiction over the facility located at the point of import or export"). That suggestion contravenes *Distrigas*. But elsewhere — and in accord with *Distrigas* — FERC acknowledged its "wide discretion" to "strike[ ] a reasonable balance between the Commission's NGA section 3 jurisdiction and traditional state jurisdiction over intrastate transportation, sales, and matters of primarily local concerns." *Id.* at p. 61135; *see also Distrigas*, 495 F.2d at 1064.

Despite these incorrect statements, FERC's declination to exercise § 3 jurisdiction over the Connector Pipeline was reasonable and reasonably explained. That's because FERC ultimately acted consistently with *Distrigas* and with three decades of its own precedents, which FERC repeatedly cited in support of its decision here. *See* 188 FERC ¶ 61029, at pp. 61134-36 & nn.128, 132; *id.* at pp. 61131-32 & nn.89, 91, 92; *see also* 186 FERC ¶ 61114, at p. 61649-50 & n.60 (2024).[5]

In explaining its decision to draw the "jurisdictional" line at the 1,000-foot mark, FERC cited a remarkably consistent line of decisions about long pipelines extending from the border. *See* 188 FERC ¶ 61029, at p. 61132 n.92; *id.* at p. 61135 n.132; 186 FERC ¶ 61114, at p. 61649 n.60. All of

---

[5] *See, e.g.*, *Valley Crossing Pipeline, LLC*, 161 FERC ¶ 61084, at p. 61564 (2017) ("When a company constructs a pipeline to import or export volumes of natural gas, only a small segment of the pipeline close to the border is deemed to be the import or export facility for which section 3 authorization is necessary.").

those decisions drew the line at or around 1,000 feet from the border, give or take a few hundred feet.[6]   These decisions are rooted in a sensible concern for respecting "traditional state jurisdiction," which we endorsed in *Distrigas,* and which FERC reiterated here.   188 FERC ¶ 61029, at p. 61135; *see Distrigas*, 495 F.2d at 1064.   That's a reasonable explanation for FERC's decision.[7]

---

[6] FERC cited nine decisions that limited jurisdiction to export facilities of the following lengths (in feet): 703, 836, 900, 1,000, 1,086, 1,093, 1,375, and 1,400.  *See, e.g.*, *NET Mexico Pipeline Partners, LLC*, 145 FERC ¶ 61112, at p. 61598 (2013) (1,400 ft.); *Coral Mexico Pipeline, LLC*, 89 FERC ¶ 61171, at p. 61516 (1999) (1,375 ft.); *Trans-Pecos Pipeline, LLC*, 155 FERC ¶ 61140, at p. 61979 (2016) (1,093 ft.); *Comanche Trail Pipeline, LLC*, 155 FERC ¶ 61182, at p. 62231 (2016) (1,086 ft.); *Valero Transmission, L.P.*, 57 FERC ¶ 61299, at p. 61299 (1991) (1,000 ft.); *Valley Crossing*, 161 FERC ¶ 61084, at p. 61562 (1,000 ft.); *Roadrunner Gas Transmission, LLC*, 153 FERC ¶ 61041, at p. 61227 (2015) (900 ft.); *Oasis Pipeline, LP*, 127 FERC ¶ 61263, at p. 62150 (2009) (836 ft.); *Houston Pipe Line Co.*, 146 FERC ¶ 61195, at p. 61855 (2014) (703 ft.).

[7] To the extent that FERC's decision also rested on its position that it had no discretion to exercise jurisdiction over the Connector Pipeline, that view does not "reflect[ ] a pervasive frame of mind" that "infuse[s]" the agency's ultimate decision with legal error. *Consolidated Edison Co. of New York v. FERC*, 823 F.2d 630, 641-42 (D.C. Cir. 1987).   We therefore see no reason to vacate FERC's decision.  *Cf. BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003) ("When an agency offers multiple grounds for a decision, we will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable."); *United States v. Ross*, 848 F.3d 1129, 1135 (D.C. Cir. 2017) ("Agencies can certainly rely on alternative rationales . . . .").

The Petitioners muster no compelling authority to show that FERC acted inconsistently with its previous decisions. To the contrary, the FERC decisions that the Petitioners cite are exceptions that prove the rule. In *Inter-City Minnesota Pipelines*, for example, the pipeline in question zig-zagged back and forth across the Canadian Border — an odd-duck pipeline presenting a unique reason for federal, rather than state, oversight. *See* 29 FERC ¶ 61105, at p. 61203-05 (1984); *id.* at p. 61203 ("no other U.S. pipeline has such a configuration"). And in *San Diego Gas & Electric Company*, FERC reasonably exercised jurisdiction over all of a two-mile border-crossing pipeline rather than subdividing it, given its exceptionally short length relative to the pipelines that FERC subdivides. 64 FERC ¶ 61221, at p. 62650-52 (1993).[8]

Whereas a case like *Inter-City* may require FERC to provide more explanation for its deviation from standard practice, in a case like Saguaro's, FERC ultimately and reasonably adhered to its longstanding practice of exercising § 3 jurisdiction over only the section of a pipeline that is close to the border.

---

[8] The Petitioners also cite two cases involving intrastate pipelines transporting natural gas to liquified-natural-gas terminals. *See* Petitioners Br. 24-25 (citing *Alaska Gasline Development Corp.*, 171 FERC ¶ 61134, at p. 61836 (2020), and *Freeport LNG Development, L.P.*, 107 FERC ¶ 61278, at p. 62294 (2004)). Those decisions are inapposite because a separate statutory provision vests FERC with *exclusive* jurisdiction over "*all* natural gas facilities located onshore . . . that are used to . . . transport . . . natural gas" to liquified-natural-gas terminals for export abroad. 15 U.S.C. § 717a(11) (definition of liquified-natural-gas terminal) (emphasis added); *id.* § 717b(e) ("exclusive authority" over liquified-natural-gas terminals).

13

**B**

As a fallback argument, the Petitioners say that even if FERC properly declined to exercise its § 3 jurisdiction over the Connector Pipeline, the pipeline is going to transport *interstate* natural gas (at least at some unknown time in the future), so it's separately subject to FERC's § 7 jurisdiction. 15 U.S.C. § 717f(c)(2).

We reject the Petitioners' arguments. Substantial evidence supports FERC's conclusion that the Connector Pipeline is not subject to FERC's § 7 jurisdiction.

**1**

The Petitioners first argue that the Connector Pipeline will transport interstate gas from the get-go. They say there's "no dispute" that it will connect with the Waha Hub, a "major interstate gas hub," which receives gas from several states. Petitioners Br. 29. And the Petitioners say that the Connector Pipeline's interconnection with the WesTex Transmission system, an intrastate pipeline, will render the Connector Pipeline interstate because WesTex carries some interstate gas.

The Petitioners are incorrect on both counts.

*First*, the Waha Hub is essentially a *pricing* center, not a reservoir of mixed-source gas that all pipelines tap into. Though lots of pipelines converge and interconnect at the Waha Hub, FERC found that the Waha Hub does not indiscriminately mix interstate and intrastate gas. While the Petitioners offered evidence that they believe showed some commingling of interstate and intrastate gas at the Waha Hub, their evidence fails to satisfy their burden to show that FERC's conclusion lacked substantial evidence.

*Second*, as to WesTex, it carries interstate gas under § 311 of the Natural Gas Policy Act, which means it is "not subject to [FERC's] jurisdiction . . . under the Natural Gas Act." 15 U.S.C. § 3301(16) (definition of "intrastate pipeline"); *see* 15 U.S.C. § 3431(a)(2)(A) ("the jurisdiction of the Commission under [the Natural Gas Act] shall not apply to any transportation in interstate commerce of natural gas if such transportation is . . . authorized by [FERC] under section 3371(a) of this title"); 15 U.S.C. § 3371(a)(2)(A) (FERC "may . . . authorize any intrastate pipeline to transport natural gas on behalf of . . . any interstate pipeline").

Granted, it is not clear "whether the downstream, intrastate transport of upstream [Natural Gas Policy Act] § 311 gas is 'NGA-exempt.'" Respondent Br. 49-50 (emphasis omitted). But FERC relied on longstanding agency precedent that such transport *is* NGA-exempt. *See Westar Transmission Co.*, 43 FERC ¶ 61050, at p. 61141 (1988) ("the most reasonable interpretation of [the Natural Gas Policy Act] is that [it] remove[s] . . . downstream transactions [of § 311 gas] from NGA jurisdiction"); 188 FERC ¶ 61029, at pp. 61137-38 (discussing *Westar*).[9] And because the Petitioners have not contested that "pertinent legal question," it's forfeited.[10]

---

[9] *See also Westar*, 43 FERC ¶ 61050, at p. 61141 ("simply exempting from NGA jurisdiction an intrastate pipeline's purchase of certain gas from out of state and the transportation of that gas to the pipeline cannot serve Congress's purpose of integrating the interstate and intrastate markets, unless the pipeline's *subsequent* transportation and sale for resale of the gas are *also* exempted from NGA jurisdiction" (emphases added)).

[10] At most, the Petitioners mentioned — in a footnote — that "Saguaro does not have authorization to transport interstate gas via Section 311," and they tersely characterized *Westar* as "fact-

Respondent Br. 48-49. Plus, just because the Connector Pipeline will have *access* to interstate gas via WesTex does not necessarily mean that the Connector Pipeline will transport it, as FERC reasonably explained. *See Valley Crossing Pipeline, LLC*, 161 FERC ¶ 61084, at p. 61565 (2017) ("The mere existence of a physical interconnection with an interstate pipeline is not sufficient to bring an intrastate pipeline under the [FERC's] jurisdiction, since being capable of receiving interstate gas is not the same as actually receiving it.").

Moreover, Saguaro represented to FERC that "when [the Connector Pipeline] begins service *all* of the gas it transports will be *produced in Texas* and only transported in intrastate commerce." JA 36 (emphases added). FERC reasonably relied on that representation, which Saguaro certified as true. *See* 18 C.F.R. § 157.6(a)(4)(i).

**2**

Short of showing that the Connector Pipeline will transport interstate gas upon commencing service, the Petitioners purport to divine that Saguaro's "primary *purpose*" or "ultimate *intent*" is to transport interstate gas sometime in the future. Petitioners Br. 43 (emphases added). Perhaps it is. Perhaps it isn't.

---

specific." Petitioners Br. 42-43 & n.13. As we have held time and again, arguments raised only briefly in footnotes or otherwise underdeveloped are deemed forfeited. *See, e.g.*, *Federal Express Corp. v. Department of Commerce*, 39 F.4th 756, 766 n.2 (D.C. Cir. 2022); *Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) ("A party forfeits an argument by mentioning it only in the most skeletal way . . . ." (cleaned up)).

The Petitioners say that FERC erred by "limiting its inquiry to Saguaro's *near-term* plans" and ignoring evidence that the Connector Pipeline is *really* being built as a future *interstate* pipeline. *Id.* at 46 (emphasis added). In other words, the Petitioners claim that Saguaro currently styles itself an "intrastate" pipeline purely for NEPA-evasion purposes, and once built, the pipeline will pivot to interstate service. They point to various statements by Saguaro, as well as a supposed capacity differential between the Connector Pipeline and the WesTex pipeline, as evidence of this intrastate–interstate bait-and-switch.

Time will tell whether the Petitioners' prediction is correct. Maybe Saguaro will transport interstate gas sometime in the future. Maybe it won't. What matters is that, on this record, we cannot know for sure (and neither can the Petitioners).

Frankly, Saguaro itself may not even know. *See, e.g.*, JA 8 n.8 ("Saguaro will not initially provide interstate transportation service pursuant to NGPA Section 311. . . , but may do so in the future . . . ."); *id.* at 31 (similar). Pipeline builders have an incentive to maximize their options. After all, customers may wish to source gas from different suppliers "over time, in response to changing supply and market conditions." Intervenors Br. 16-17.

Saguaro is entitled to keep its options open. It can begin with intrastate service, with the option to seek § 311 authorization later. When a company makes that choice, nothing requires FERC to guess the future and assert § 7 jurisdiction up front. *Cf. Big Bend Conservation Alliance v. FERC*, 896 F.3d 418, 422-23 (D.C. Cir. 2018) (It "merely restates applicable law" to note that "*if* the pipeline someday provides qualifying service under Section 311, that service will

not subject the pipeline to Section 7."); *id.* at 423 ("FERC precedent recogniz[es] that new intrastate pipelines may provide Section 311 service after being placed into service" (citing FERC decisions)).[11]

The Petitioners respond that Saguaro isn't just reserving the option to pursue § 311 service at some indeterminate point down the road; Saguaro, they say, has designed the Connector Pipeline with the present intent to seek § 311 service shortly after circumventing §7 public-interest and NEPA review. In support of their claim, they assert that Saguaro's Connector Pipeline will have significant capacity — 2.8 billion cubic feet/day (Bcf) — which "dwarfs the WesTex pipeline system that Saguaro claims will serve it." Petitioners Br. 47-48.

But intrastate sources' capacity actually dwarfs Saguaro's. Although the WesTex line currently has only about 0.8 Bcf capacity, Saguaro identified eight other potential upstream sources. Those sources have up to 5 Bcf in capacity.

---

[11] The Intervenors say that it is "commonplace" for pipeline builders to engage in an intrastate–interstate two-step; indeed, they say it's a "well-understood approach." Intervenors Br. 28. The Petitioners, meanwhile, worry that this approach effectively uses § 311 to "bypass" § 7 public-interest and NEPA review. Petitioners Br. 50-52. But we leave this hypothetical dispute for another day. As in *Big Bend*, "the orders under review" here "do not prospectively authorize" the Connector Pipeline "to transport natural gas under Section 311." 896 F.3d at 422. "[N]either the Authorizing Order nor the Rehearing Order commits the agency to any particular course of action should" Saguaro "seek to provide Section 311 service in the future." *Id.* at 423 (emphasis omitted). If FERC later "discover[s] that Saguaro was just building this pipeline as a ruse to transport [interstate] gas," FERC will have the opportunity to address the issue in the first instance. Oral Arg. Tr. 48-49 (FERC counsel).

The Petitioners weakly protest that Saguaro hasn't pinned down which exact source(s) it will draw from or provided any concrete precedent agreements or shipping contracts to demonstrate its exact plans. But that hardly negates the substantial evidence on which FERC relied. So the Petitioners' objection fails.

At bottom, this case is like *Big Bend*. 896 F.3d at 422-23. On similar facts, *Big Bend* upheld FERC's § 7 determination that an export facility's Texan connector pipeline wouldn't transport interstate gas ab initio, and that interstate gas transport was not its "only realistic, or even primary, use." *Id.*; *see also id.* at 422 ("substantial evidence supports FERC's conclusion that the pipeline initially will only transport [intrastate] natural gas" where (1) the "pipeline is located entirely within Texas," (2) the pipeline "is directly connected with other intrastate pipelines," (3) "there is abundant Texas-sourced natural gas to supply the Trans-Pecos Pipeline without relying on interstate volumes," and (4) "Trans-Pecos specifically represented that the pipeline would, in fact, carry only gas produced in Texas" (cleaned up)). We reach the same conclusion here.

Nothing in our decision precludes the Petitioners or another party from bringing a challenge in the future should the Petitioners' prediction bear out. What matters for present purposes is that here, as in *Big Bend*, FERC's "orders under review do not prospectively authorize" the Connector Pipeline "to transport natural gas under Section 311." *Big Bend*, 896 F.3d at 422. "[N]either the Authorizing Order nor the Rehearing Order commits the agency to any particular course of action should" Saguaro "seek to provide Section 311 service in the future." *Id.* at 423. If the record later reflects that the primary purpose of the Connector Pipeline is to transport interstate gas pursuant to Section 311, FERC can reconsider the

pipeline's regulated status at that point either on review of a petition or of its own accord.[12]

\* \* \*

To sum up on § 7 jurisdiction, FERC's conclusions are based on substantial evidence in the record: The Connector Pipeline is located entirely within Texas; Saguaro certified that the Connector Pipeline will carry only intrastate gas upon commencing service; and the Connector Pipeline will have access, via eight other upstream sources, to 5 Bcf of *intrastate* gas — nearly *double* the Connector Pipeline's capacity. *See* JA 212-19, 431-39.[13]

Accordingly, the Connector Pipeline is not subject to FERC's § 7 jurisdiction.

**IV**

The Petitioners claim that FERC's approval of the Border Facility was arbitrary and capricious. We disagree.

The Natural Gas Act "sets out a general presumption favoring authorization." *Center for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (cleaned up).

---

[12] We express no opinion about what options might then be available to FERC.

[13] The Petitioners make much of FERC's supposed failure to verify Saguaro's certification that it will provide only intrastate service initially. But Saguaro certified to the truth of its representations in the administrative record much like lawyers certify to papers they file. *See* 18 C.F.R. § 157.6(a)(4)(i); *cf.* Fed. R. Civ. P. 11(b). And the Petitioners have offered no reason to doubt the veracity of those representations.

"FERC 'shall issue' authorization" for export facilities "'unless' it determines doing so 'will not be consistent with the public interest.'" *Id.* (quoting 15 U.S.C. § 717b(a)). The Petitioners have the burden to rebut that presumption and show, affirmatively, that approving the Border Facility is inconsistent with the public interest.

The Petitioners argue that FERC treated adverse impacts versus benefits inconsistently. On the Petitioners' telling, FERC asymmetrically considered benefits downstream of the Border Facility while dismissing adverse impacts upstream of the border crossing.

The record does not support that theory. FERC's mention of downstream benefits merely responded to an argument during notice and comment *from Petitioner Sierra Club*. *See* JA 411. This court has long affirmed reliance "on the presumptions" in favor of authorizing natural-gas facilities, and has put "the burden on the opponent consistent with section 3 of the NGA, requiring an affirmative showing of inconsistency with the public interest to deny an application." *New England Fuel Institute v. Economic Regulatory Administration*, 875 F.2d 882, 889 (D.C. Cir. 1989) (cleaned up) (emphasis omitted); *see also Sierra Club v. DOE*, 867 F.3d 189, 203 (D.C. Cir. 2017) (requiring "affirmative showing of inconsistency with the public interest to deny the application" (cleaned up)).

We reaffirm that reliance here and reject the Petitioners' claim.

**V**

Finally, the Petitioners claim that FERC violated the National Environmental Policy Act. They present three theories. Each fails.

**A**

*First*, the Petitioners accuse FERC of gerrymandering the Border Facility's "purpose and need" in the Environmental Assessment to allow for only one feasible alternative: the Border Facility as proposed.   We cannot agree.

NEPA requires agencies to consider "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of the proposal."   42 U.S.C. § 4332(2)(C)(iii).   In identifying "feasible alternatives" for NEPA analysis, FERC "exercises substantial discretion," and we "must be at [our] 'most deferential.'"   *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 145 S. Ct. 1497, 1512 (2025) (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 (1983)).

The Petitioners' objection to FERC's Border Facility alternatives analysis rests on the tension between a "reasonable *range*" of options and a *specific* "purpose and need." 42 U.S.C. § 4332(2)(C)(iii) (emphasis added).   Because objectives limit alternatives, the more specific the objective, the narrower the range of alternatives.   This relationship can be exploited: If an agency "define[s] the objectives of its action in terms so unreasonably narrow that only one alternative . . . would accomplish the goals of [its] action, . . . the [NEPA analysis] would become a foreordained formality."   *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (Thomas, J.).

The Petitioners say that's what happened here: FERC defined the "purpose and need" of the Saguaro Border Facility project in terms so "unreasonably narrow" that there was really only one alternative.   Petitioners Br. 55 (cleaned up).   That

purpose was to connect the Connector Pipeline from the Waha Hub to the Sierra Madre pipeline in Mexico. And that admitted of only one option: a 1,000-foot stretch of pipeline straddling the Rio Grande at a particular location.

FERC reasonably explained, however, that it does not have extraterritorial jurisdiction over the siting of the Mexican Sierra Madre pipeline, nor does it have § 7 jurisdiction over the intrastate Connector Pipeline.[14]  *See Citizens Action Coalition of Indiana, Inc. v. FERC*, 125 F.4th 229, 237 (D.C. Cir. 2025) ("NEPA does not require FERC to consider . . . alternatives that are outside of FERC's jurisdiction and would fail to serve the purpose of the Project.").  The purpose of the Saguaro project before FERC is simply to connect these "two non-jurisdictional pipelines at the U.S.–Mexico border."  186 FERC ¶ 61114, at p. 61658 (2024).  Nothing about FERC's framing of this purpose evinces an unreasonable or artificially narrow constraint on the "reasonable range of alternatives" for its NEPA analysis.  42 U.S.C. § 4332(2)(C)(iii).

To be sure, FERC has no "license to fulfill [its] own prophecies."  *Busey*, 938 F.2d at 196.  But there is no self-fulfilling prophecy where, as here, FERC "is asked to sanction a specific plan," and it has simply "take[n] into account the needs and goals of the parties involved in the application" — here, Saguaro's need to link the Connector Pipeline to the Sierra Madre pipeline across the Texas–Mexico border.[15]  *Id.*; *see Citizens Action*, 125 F.4th at 237 ("Because

---

[14] As already explained, FERC has elected — in keeping with its consistent practice — not to wield its § 3 jurisdiction over the Connector Pipeline.  *See supra* section III.A.

[15] Also, FERC "should always consider the views of Congress, expressed . . . in the agency's statutory authorization to act."  *Busey*,

FERC is considering a private proposal, it 'may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project.'" (quoting *City of Grapevine v. Department of Transportation*, 17 F.3d 1502, 1506 (D.C. Cir. 1994))).   Thus, and in accord with the "substantial deference" that we owe to FERC's alternatives analysis, we reject the Petitioners' argument.  *Seven County*, 145 S. Ct. at 1513.[16]

**B**

The Petitioners next claim that as a part of its NEPA review, FERC should have considered the upstream environmental impacts of the Connector Pipeline as "[i]ndirect effects" of the Border Facility.   *See* 40 C.F.R. § 1508.1(i)(2). As the Petitioners have since recognized, this argument runs headlong into the Supreme Court's recent "course correction" in *Seven County*.   145 S. Ct. at 1514; *see* Petitioners' 28(j) Letter (June 9, 2025) (express waiver).

*Seven County* pared back NEPA's jurisprudential growth from a "legislative acorn . . . into a judicial oak that has hindered infrastructure development under the guise of just a

---

938 F.2d at 196.   Here, Congress has expressed its support for natural-gas exportation.   *See* 15 U.S.C. § 717b(a).

[16] The Petitioners also suggest that FERC should have considered smaller alternatives to Saguaro's proposed 48-inch diameter pipeline.   But they make no argument that a smaller-diameter Border Facility would serve the project's purposes, so FERC had no obligation to consider the feasibility of a smaller pipeline as an alternative.   *See* Petitioners Br. 57-59; 186 FERC ¶ 61114, at pp. 61657, 61659; 188 FERC ¶ 61029, at p. 61154.

little more process." 145 S. Ct. at 1514 (cleaned up).[17] "The textual focus of NEPA is the 'proposed action' — that is, the project at hand." *Id.* at 1512 (quoting 42 U.S.C. § 4332(2)(C)); *see also id.* at 1517. The Court made clear that in considering the effects of a "proposed action" under NEPA, an "agency may draw what it reasonably concludes is a manageable line — one that encompasses the effects of the project at hand, but not the effects of projects separate in time or place." *Id.* at 1517 (cleaned up). And even as to projects "interrelated and close in time and place to the project at hand," courts "must remain deferential" to the line that the agency draws "so long as" it is "reasonable and manageable." *Id.* (cleaned up).

Here, FERC drew the line at the Border Facility. That line is reasonable, and we defer to FERC's sound exercise of discretion. *See id.* at 1518 ("An agency may decline to evaluate environmental effects from separate projects upstream or downstream from the project at issue."). Because FERC reasonably declined § 3 jurisdiction over the 157-mile upstream pipeline, it reasonably concluded that that pipeline was not part of a "single project *within [its] authority*" as to which it had to assess environmental effects. *Id.* at 1517 (emphasis added); *see id.* at 1516 ("agencies are not required to analyze the effects of projects over which they do not exercise regulatory authority"); *supra* Section I.A. The Supreme Court has shut the courthouse door to NEPA nitpicking in the name of causally attenuated indirect effects. *See id.* at 1515 ("The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference.").

---

[17] *Cf. Appalachian Voices v. FERC*, 139 F.4th 903, 922, 925 (D.C. Cir. 2025) (Henderson, J., concurring) (describing how "lower courts divined an entire common law of NEPA" that rendered its "blast radius . . . boundless" (cleaned up)).

25

C

Finally, the Petitioners argue that, per FERC's own regulation, it must "do an environmental review" of the Connector Pipeline as a "project-related nonjurisdictional facilit[y]." 18 C.F.R. § 380.12(c)(2)(ii). But that argument is foreclosed by *Big Bend Conservation Alliance v. FERC*. *See* 896 F.3d 418, 424-25 (D.C. Cir. 2018).

The FERC regulation in question presents a four-factor balancing test used to determine whether there is sufficient federal control over a state facility to necessitate NEPA analysis. 18 C.F.R. § 380.12(c)(2)(ii)(A)-(D); *see Algonquin Gas Transmission Co.*, 59 FERC ¶ 61255, at p. 61934 (1992). Here, the Petitioners' general idea is that FERC's authorization of the Border Facility suffices to "federalize" the related upstream Connector Pipeline for purposes of NEPA review. *Cf. Big Bend*, 896 F.3d at 424 (same argument).

*Big Bend* soundly rejected this "federalization theory." *Id.* at 424-25. "NEPA claims must be brought pursuant to the APA," which authorizes review only of "final agency action" — that is, "final action by an agency of 'the *Government of the United States*.'" *Id.* at 424 (emphasis added) (quoting 5 U.S.C. § 701(b)(1)). Because FERC isn't authorizing the Connector Pipeline — the Texas Railroad Commission is — there's no final *federal* agency action to serve as the basis for a NEPA–APA claim. *See Sierra Club v. United States Army Corps of Engineers*, 803 F.3d 31, 50-51 (D.C. Cir. 2015).

VI

For these reasons, we deny the petition.

26

*So ordered.*